IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs in Jackson on June 6, 2017

**STATE OF TENNESSEE v. JEANET MARIE COVINGTON**

**Appeal from the Criminal Court for Davidson County**
**No. 2014-D-3175      Monte Watkins, Judge**

———————————————————

**No. M2016-02310-CCA-R3-CD**

———————————————————

A Davidson County jury convicted the Defendant, Jeanet Marie Covington, of aggravated arson, and the trial court sentenced her to serve fifteen years in the Department of Correction. The Defendant timely filed a motion for new trial, which the trial court denied. The Defendant appeals the trial court's denial of her motion, maintaining that the evidence was insufficient to support her conviction. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Luke Hammond, Nashville, Tennessee, for the appellant, Jeanet Marie Covington.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a house fire that occurred on August 6, 2014. A Davidson County grand jury indicted the Defendant for aggravated arson and domestic assault. At a trial on the charges, the parties presented the following evidence: Shetika Goode testified that she used to live on Fain Street. She said that she had three children, ages fifteen, twelve, and seven, who lived with her on August 6, 2014. Ms. Goode noted that at the time of this event her son, who was autistic, had recently been hospitalized for seven days due to a "near drowning incident." Still recuperating from this incident, he, along with his siblings, were in the home at the time of the fire. While Ms. Goode lived in the home with her three children, Deshawn Covington had been "staying there" for a

couple of days.  Ms. Goode confirmed that she was aware Mr. Covington lived with another woman but was unaware that he was married.

Ms. Goode testified that August 6, 2014, was the first day of school for her children.  At the time, she worked third shift, from 10:00 p.m. until 7:00 a.m., at a manufacturing company.  After work, she returned home where Mr. Covington was watching her children.  She took her children to school and then returned to the house.  Mr. Covington was still at the residence when she arrived.  Shortly after she returned home, someone knocked at the door.  Ms. Goode looked out the window and saw the Defendant, who was yelling "about a prescription."  According to Ms. Goode, the Defendant claimed that she had learned that Ms. Goode had picked up the Defendant's husband's, Mr. Covington's, prescription and wanted to know Ms. Goode's name.

Ms. Goode testified that she began to open her door, and the Defendant pushed her way inside and walked back to the bedroom where Mr. Covington was sleeping.  By the time Ms. Goode made it to the bedroom, the Defendant was "on top of [Mr. Covington] hitting him."  The Defendant and Mr. Covington began to "scuffle[ ] a little bit," and Ms. Goode warned them she was going to call the police.  Ms. Goode repeated that she was going to call the police and the Defendant began "scuffling" with Ms. Goode.  Ms. Goode told Mr. Covington that she wanted the Defendant out of her house, so Mr. Covington picked up the Defendant and "started hauling her to the front door."

Ms. Goode testified that she began picking up items that had been knocked to the floor during the altercation and called 911, who advised that the police were already at her residence.  Ms. Goode went outside and found the Defendant talking with police officers.  Both the Defendant and Mr. Covington were arrested.  Twelve hours later, Mr. Covington was released from jail, and Ms. Goode drove to the jail to pick him up.  Mr. Covington exited the building with the Defendant who appeared "angry" that Mr. Covington was leaving with Ms. Goode.  To avoid another altercation, Mr. Covington flagged down a police officer for assistance.  Ms. Goode said that Mr. Covington had obtained an order of protection against the Defendant.  Ultimately, Mr. Covington left with Ms. Goode, and the Defendant left with her mother.

Ms. Goode testified that, when she arrived home, Mr. Covington and his mother went inside while she remained outside and spoke with LaFonda Matthews.  Ms. Goode explained that her daughter and Ms. Matthews's daughter were best friends.  Ms. Goode and Ms. Matthews walked into the house and to the kitchen.  Ms. Goode recalled that her three children were asleep on the couch, Mr. Covington was in the bedroom, and Mr. Covington's mother was standing next to the television located near the entry of the house.  Ms. Goode charged her phone while in the kitchen and approximately thirty minutes later, while still in the kitchen, she saw a person outside the window.  She said

that she did not know what it was at the time but that she saw "a person's arm go up, I seen a glare."

Ms. Goode testified that the subsequent events "just kind of happened fast." She looked to her left and saw smoke coming out of her bathroom. She opened her back door and saw the Defendant. She recognized the Defendant because of her "distinctive" hair cut which Ms. Goode described as "a low cut. It was shaved on the sides and on the back and it had hair at the top." Ms. Goode began yelling for her children to get out of the house because the house was on fire. She grabbed her son, and the other children followed. Ms. Goode then moved her car, so it would not catch on fire. One of her daughters began having a panic attack.

Ms. Goode testified that Mr. Covington tried to put out the fire but was unable to do so. Mr. Covington came from around the back of the house and collapsed in the front yard. He was later transported to the hospital in an ambulance. Ms. Goode told the firemen that she needed to get her dog, a Shihtzu, out of the house, but they would not allow her to reenter the house. Firemen entered the residence and retrieved the dog who was suffering an asthma attack.

Ms. Goode testified that she had moved into the residence on Fain Street two months before the fire. She said "everything" in the residence she had purchased new for her new home. She had bought a new stove and refrigerator on credit, and she had been unable to make the payments following the fire. Ms. Goode confirmed that she did not have renter's insurance at the time of the fire. Ms. Goode confirmed that she lost "most" of her valuables in the fire.

Ms. Goode testified that, at the time of these events, she was hysterical, in shock, and angry. Ms. Goode identified photographs taken of her home and the resulting damage. Ms. Goode confirmed that in 2009 she was convicted of theft.

LaFonda Matthews testified that she was at the residence on Fain Street on the night of August 6, 2014. She could not recall the exact time but said that she had picked up her friend, Ms. Smythe, from work and then gone to the Fain Street residence. Ms. Matthews said that Ms. Smythe waited in the car while she went inside to talk with Ms. Goode. Ms. Goode and Ms. Matthews went into the kitchen so that Ms. Goode could charge her cell phone. The women remained in the kitchen talking about their daughters for about thirty minutes when, through the window, she saw someone run "in the alley," and get into a car. Ms. Matthews said that she smelled smoke, so went to the door and saw "a great big fire." After seeing the fire, she began yelling for everyone to get out of the house and "as soon as [they] got out of the house, the house went in flames." She described these events as having "happened so quick."

Ms. Matthews testified that she did not see the Defendant's face that night but based upon her shape and distinct haircut, "a 27 piece," she identified the Defendant in court as the person she saw fleeing the Fain Street residence in August 2014. Ms. Matthews stated that the Defendant got into the driver's seat of the vehicle that was parked in the alley located at the rear of the Fain Street residence. Ms. Matthews stated that she had never seen the Defendant before the night of the fire.

On cross-examination,[1] Ms. Matthews testified that, when she saw the Defendant running down the alley, the Defendant was wearing a white t-shirt. She stated that she identified the Defendant when the police returned the Defendant to the scene. She said the Defendant had the same skin color, body shape, and hairstyle as the person she observed outside the Fain Street residence.

Kapriese Smythe testified that, on August 6, 2014, LaFonda Matthews picked her up from work at around 11:00 p.m., and the two drove to a residence on Fain Street. Ms. Smythe said that she had never been to the residence before and did not know any of the occupants. She waited in the car while Ms. Matthews went inside. While waiting, she was "on [her] phone," however, she observed that the house was well-lit. Ms. Smythe was focused on her phone but "happened to look up" and saw a female, later identified as the Defendant, "take off running." This struck Ms. Smythe as odd, and as she sat in the car, she noticed "the light from the back of the house getting bigger and bigger." As she began to see smoke rising from the house, "it dawned on [her]" that the Defendant had set the house on fire.

Ms. Smythe testified that she watched the Goode family run out of the burning house approximately ten minutes after she had seen the Defendant run from the residence. Ms. Smythe confirmed that she was able to view the Defendant's face clearly. She described the Defendant as having "a bigger build" and wearing a white t-shirt and blue jeans. She said that the Defendant had a short haircut, consistent with the Defendant's hair style at trial.

Ms. Smythe described the Goode family, Ms. Matthews, and "the kids" all fleeing from the burning residence "coughing and stuff from inhaling the smoke." She recalled that "the boyfriend" remained in the residence trying to put out the fire but eventually "came out and he fell on the ground because he was, he inhaled a lot of smoke." When the fire marshals and police officers arrived, Ms. Smythe relayed what she had observed to them and provided a description of the Defendant.

---

[1] Page 109, the beginning of the cross-examination, is absent from the transcript.

Ms. Smythe testified that she saw the Defendant again that night when a police officer brought her to the scene. Ms. Smythe identified the Defendant as the person she had seen running from the Fain Street residence earlier. She said that the Defendant had changed clothes and was wearing a dress by the time the police brought her to the Fain Street residence.

Jason Smith, a Metropolitan Nashville Police Department ("MNPD") officer, testified that he was dispatched to the Fain Street residence at around 10:00 a.m. on the morning of August 6, 2014. When he arrived, he observed a female standing near her car down the street, two or three houses, from the actual address. Officer Smith identified the Defendant as the female standing by the car that "waved him down a little bit." Officer Smith conducted an investigation and as a result arrested both the Defendant and Mr. Covington. He explained that both parties had committed an assault, and he was unable to determine the primary aggressor. Officer Smith believed he used the Defendant's driver's license to record personal information and then returned the license to her. At some point, another woman, later identified as the Defendant's mother, arrived on the scene, and the officers allowed the Defendant to give to her mother any personal items she did not want taken at the jail.

On cross-examination, Officer Smith stated that he was not "a hundred percent" certain that the Defendant had a driver's license but that he did fill in the required information, usually obtained from a driver's license, on the Incident Report. He recalled the Defendant asking about her car keys. The officer stated that the Defendant was talkative but not making any threats at the time of his exchange with her.

Paul Ellis, an MNPD officer, testified that he reported to the Fain Street residence shortly before midnight on August 6 and worked into the early morning hours of August 7, 2014, with the fire department to ensure safety. Based upon his experience as a patrol officer in that area, Officer Ellis estimated that it would take approximately one minute to drive from the Fain Street residence to the Defendant's residence. Officer Ellis explained that, typically, when someone was arrested in relation to a domestic dispute, the commissioner would set a twelve-hour mandatory "cooling off period" before a defendant could be released on bond.

David Harper, a MNPD detective, testified that on August 6, 2014, he responded to a report of a domestic dispute at the Defendant's residence. Dispatch provided Detective Harper with a description of the suspect, and, when he arrived at the address, he observed the Defendant enter the address. Before back-up officers arrived, the Defendant exited the residence. Detective Harper approached the Defendant, confirmed her name, and took her into custody. The arrest occurred at 12:19 a.m., August 7, 2014.

Detective Harper placed the Defendant in the back of his vehicle and returned the Defendant to the crime scene.

On cross-examination, Detective Harper described the Defendant as having worn a multi-colored floral dress on the night of this incident. He said that the Defendant did not smell like gasoline but did smell "smokey."

Billy Deering, a Nashville Fire Department ("NFD") Deputy Fire Marshal, testified as an expert witness in the field of fire cause and origin. In the early morning hours of August 7, 2014, Deputy Fire Marshal Deering met with the Defendant at a colleague's request. He stated that he noticed that her hair was singed on the right side of her head, and he identified a photograph he took of the Defendant's singed hair. He said that he met with the Defendant in an interview room and although he could see her singed hair, he did not smell smoke emanating from the Defendant. He explained that the Defendant told him that she had taken a shower.

Roy Watson, a NFD fire investigator, testified that the fire call came in at 11:42 p.m. on August 6, 2014, and he arrived at the scene at 12:18 a.m. He stated that there were "on going fire operations" when he arrived and flames on the left side of the house. He recalled that there were nine fire trucks, three EMS units, three vehicles, and twenty-three personnel at the Fain Street residence. Investigator Watson was advised that a dog had been rescued from the house and that the residence was "cleared."

Investigator Watson testified that District Chief Nunn advised him as to the status of the fire, explaining that there was heavy smoke and flame over the rear of the house and that firefighters were "venting the roof structure . . . to get to the fire." The fire had reached the attic and spread. As Investigator Watson followed District Chief Nunn to the location believed to be the start of the fire, Investigator Watson observed an ID with a dollar bill lying on top of it on the ground next to the wall of the house. He stated that he photographed the license and bill and then retrieved both. He noted that these items were found within ten feet of the area he later determined was the origin of the fire.

Investigator Watson testified that, when he reached the rear of the house, he noted that the fire had extended from the ground, up the eave, into the roof structure. Because there were ongoing fire operations, he went no further. Investigator Watson returned to the front of the residence and spoke with police officers. He learned that the police had the description of a "person of interest" seen fleeing the scene. This person had been found, returned to the scene, and positively identified by witnesses. Investigator Watson produced the ID he had found near the residence and asked the officer if the ID belonged to the "person of interest." The officer confirmed that the person on the ID was the same

- 6 -

as the person in custody. Investigator Watson requested that the Defendant be transported to Hermitage Police Precinct for questioning.

Investigator Watson identified photographs taken at the crime scene and explained how he determined that the origin of the fire began on top of the deck at the rear of the house with a "secondary fire" coming from the ground. During his investigation, Investigator Watson found, on the ground, a black cloth material that was saturated with what he believed to be a flammable or ignitable liquid. He collected the cloth and submitted it to the TBI for testing. Investigator Watson explained that based upon the burn patterns on the deck, he believed the cloth was used to ignite the fire and as the fire "got to rolling," the material fell off the deck onto the ground and started the secondary fire.

Investigator Watson described the path of the flames as follows:

> Once the fire got into the eave of the structure, one of the things fire feeds off of is the oxygen. So as it's feeding off of the wood, the combustion of the wood and the wood siding, it's looking for oxygen and it goes, just like water, the path of least resistance. And it's going straight up, as a flame does, and once it got into that attic, it rolled till it found that oxygen and it started to shoot across the attic structure of this house.

Investigator Watson identified photographs he took of a frame circuit in the roof assembly used to eliminate electrical fault as the cause of the fire. Based upon his investigation, he determined that the fire was set on the exterior of the home. Investigator Watson identified another photograph of the kitchen window and confirmed that from that window one could see the deck and backyard area.

Investigator Watson testified that following his investigation, his conclusion was that the fire was incendiary, meaning "set by human hands." He stated that the house was "a total loss." The damage sustained to the roof rendered it structurally unsafe. All contents within the house that were not burnt or melted by the heat sustained significant smoke damage. He further opined that all furniture and clothing in the home was "rendered useless."

Rielly Lewis, a Tennessee Bureau of Investigation ("TBI") criminal investigator, testified that prior to her position at the TBI as a criminal investigator she worked in the microanalysis unit specializing in fire debris analysis. Agent Lewis stated that, in this role, she analyzed materials from the crime scene. Specifically, the NFD provided her with a piece of charred cloth. Her analysis of the cloth revealed the presence of "an evaporated gasoline range product."

After the conclusion of the State's proof, the defense presented the following witnesses: Deshawn Covington testified about his interaction with the Defendant on the morning of August 6, 2014. He recalled that the Defendant knocked on Ms. Goode's door, and he advised Ms. Goode not to answer the door because he was concerned that the Defendant would try to enter. Mr. Covington held the bedroom door to prevent the Defendant's entry, but she ultimately entered and the two began to "tussl[e]." Mr. Covington clarified that it was not so much a "tussle" as he was "trying to get her off [him]." At some point, he told the Defendant to leave, and she left the house. He estimated that this interaction lasted approximately twenty minutes during which "all kinds of stuff was all knocked over."

As a result of this interaction, Mr. Covington was arrested. He was released from jail at around 11:00 p.m. that night. When Mr. Covington exited the jail building, the Defendant was in the parking lot with her mother, and the Defendant wanted to know with whom he was going to leave. Mr. Covington told her he would be leaving with Ms. Goode, and he did so. He stated that there was no argument or altercation between the Defendant and him outside the jail.

Mr. Covington testified that he rode to the Fain Street residence with Ms. Goode and, approximately forty-five minutes after they arrived, the fire started. He said that he was in the kitchen with Ms. Goode and Ms. Matthews and was going to cook some food. He said he thought he had left the stove on because he saw smoke at the rear of the house. Mr. Covington could not recall who first noticed the smoke, but he said that when he opened the back door, there was smoke and flames. Ms. Goode and Ms. Matthews ran to get the children out of the house. Once everyone had exited, Mr. Covington went out the back and tried to "grab a hose pipe" to put out the fire. He and Ms. Goode's neighbor tried until the neighbor advised him, "leave it alone, there's no more you can do."

Mr. Covington testified that he was the only person to open the back door, and he was alone when he opened the back door. He stated that Ms. Matthews and Ms. Goode ran to get the children as soon as they observed the smoke and then exited out the front door. Mr. Covington stated that he did not see anyone outside when he opened the back door.

On cross-examination, Mr. Covington testified that he was not ever married to the Defendant. He explained that, before this incident and while he was incarcerated on unrelated charges, the Defendant changed her name and brought him a marriage certificate in jail, but the two never legally married. Mr. Covington confirmed that he had two prior felony convictions: aggravated burglary and possession of a controlled substance with intent. Mr. Covington agreed that on the morning of August 6, 2014, he

- 8 -

physically picked up the Defendant and removed her from the house. He maintained that he and the Defendant did not engage in an argument outside the jail upon their release. He reiterated that the Defendant asked with whom he was leaving, and he told her Ms. Goode. He testified that the Defendant was not mad at the time. Mr. Covington testified that he and the Defendant were again in a romantic relationship at the time of trial.

Mr. Covington testified that, on the morning of August 6, 2014, when the Defendant learned Ms. Goode had picked up his prescription, she was angry.

The Defendant testified that she had two prior convictions for assault. The Defendant recalled that on the morning of August 6, 2014, she went to pick up Mr. Covington's prescription from the pharmacy and was told "Shetika Goode" had already picked up the prescription. The Defendant drove to Ms. Goode's home and asked Ms. Goode if she had picked up the prescription, and she denied doing so. Ms. Goode opened the door, and the Defendant walked back to the bedroom where she "hit [Mr. Covington] upside his head with [her] hand." The two engaged in a "scuffl[e]," during which she lost her keys. She then explained that she had her driver's license in the pocket of her pants because she always carried it when she retrieved prescriptions.

The Defendant testified that she stood outside on the sidewalk while Mr. Covington sat on the porch steps and Ms. Goode stood at her gate. The Defendant stated, "We was having words back and forth, and the police pulled up and he, they separated us." The police spoke with her individually and asked for her identification, which was when she realized that she no longer had her driver's license. After speaking with all parties, the officer determined that both the Defendant and Mr. Covington were aggressors and arrested them. The Defendant called her mother to come to the Fain Street address because she was afraid she would be arrested. She told her mother that she had lost her driver's license and her keys and then the police officer transported her to jail.

The Defendant testified that she and Mr. Covington exited the jail together later that night. As they walked out, she asked him what he planned to do, and he responded that he was leaving with Ms. Goode because he and the Defendant fought too much. He asked to be allowed to be involved with their children, and the Defendant agreed. She said that they then each went their own "way." She denied having "words" with Ms. Goode or a fight with Mr. Covington outside the jail. She agreed that she had been angry earlier in the day but said that, at the time they left the jail, she felt that she "had to respect what the decision that he made." The Defendant identified her property receipt from her release the night of August 6, 2014 which showed that she left the jail with no personal property.

The Defendant testified that after release from jail, she took a shower and then her daughter drove her to several residences looking for her son. She was unable to find him, so returned home where she began cleaning house. She took a broken laundry rack outside to throw away and that was when a police officer approached her about the fire.

When asked if there was anything she wanted to say in response to the testimony about her hair, the Defendant testified that, the day before the fire, she had her "hair done," and her stylist used flammable products on her hair. She denied setting fire to Ms. Goode's house. She maintained that she was looking for her son at the time that the fire was started. She said that she and Mr. Covington talked at the jail and they were "fine." She said she "respected his decision" and denied being "upset."

On cross-examination, the Defendant denied telling the arresting officer at the fire that she had given her driver's license to the arresting officer in the morning at the time of her earlier arrest. She maintained that she did not have her license at that time. The Defendant agreed that she told the arresting officer at the time of the fire, that she had instructed her daughter to "get gas." The Defendant explained that, while her daughter went to purchase gas, she showered and changed. The Defendant confirmed that she arrived home from jail on the night of August 6, 2014 at around 11:15 p.m., and the officer approached her while she was throwing out the broken laundry rack at 12:18 a.m.

The State recalled Officer Smith in rebuttal. Officer Smith testified that, normally, he documented in the incident reports any concerns or questions his arrestees say repeatedly or that he finds to be "key statements." In his incident report involving the August 6 morning arrest, he noted that the Defendant inquired only about her keys.

The State also recalled Marshal Deering in rebuttal. Marshal Deering identified the audio recording he made of his interview with the Defendant. On the recording, the Defendant stated that she gave her driver's license to the arresting officer during the morning arrest. She said that, when he returned it to her, she gave the license along with her other belongings to her mother before being transported to jail. Marshal Deering confirmed that this was what the Defendant had told him during the interview. Marshal Deering stated that the Defendant also told him she did not know where her driver's license was at the time of the interview.

After hearing the evidence, the jury found the Defendant guilty of aggravated arson and not guilty of domestic assault. At a subsequent sentencing hearing, the trial court sentenced the Defendant to fifteen years in the Department of Correction. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant argues that the evidence was insufficient to sustain her conviction because the witnesses' identification was unreliable. The State responds that the question of identity is a jury question that was resolved by the jury when it convicted the Defendant of aggravated arson. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary

instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

An offender commits arson by knowingly damaging any structure by means of a fire or explosion with the intent to destroy or damage the structure for any unlawful purpose. T.C.A. § 39-14-301. A person commits aggravated arson who commits arson as defined in Tennessee Code Annotated section 39-14-301 when one or more persons are present therein. T.C.A. § 39-14-302.

The evidence, viewed in the light most favorable to the State, proves that on August 6, 2014, the Defendant went to the Fain Street address and found Mr. Covington staying with another woman. After a physical altercation with Mr. Covington, both the Defendant and Mr. Covington were arrested. Upon their release on the same date, Mr. Covington chose to leave the jail with Ms. Goode rather than the Defendant, which angered the Defendant. Shortly thereafter, Ms. Goode observed an arm and a flash of light outside her kitchen window at the rear of the residence, an area that was later identified as the location of origin of the fire. Ms. Goode opened the back door to identify the source of the smoke and saw the Defendant fleeing. In addition, Ms. Matthews and Ms. Smythe observed the Defendant fleeing the Fain Street residence around the time of the fire. The Defendant was apprehended shortly after the fire and spoke with Deputy Fire Marshal Billy Deering who observed that the Defendant's hair was singed on the right side of her head. There were six people inside the Fain Street residence at the time of the fire. The fire arson investigator determined that the fire was "incendiary" and during his inspection collected the Defendant's identification and a dollar bill on the ground beside the house. He described the damage to the house as a "total loss." This is sufficient evidence upon which a jury could find the Defendant guilty of aggravated arson.

- 12 -

The Defendant specifically argues that the State failed to prove her identity as the perpetrator of this offense. She asserts that her identity is based solely on Ms. Matthews and Ms. Smythe, who she asserts were "unreliable." We agree that the identity of the perpetrator is an essential element of any crime, and therefore must be proven by the State beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). We would also note that issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*. And, as stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Bland,* 958 S.W.2d at 659. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. Therefore, we conclude that the State presented sufficient evidence of identity to support the Defendant's convictions.

Based upon the evidence, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that the Defendant is guilty of aggravated arson. Thus, the Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude the record sufficiently supports the Defendant's conviction for aggravated arson. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE